## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARJORIE DIEHL-ARMSTRONG,** | : | **CIVIL NO. 1:13-CV- 2302** |
| | : | |
| **Petitioner,** | : | **(Judge Jones)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **PENNSYLVANIA BOARD** | : | |
| **OF PROBATION AND PAROLE,** | : | |
| | : | |
| **Respondents.** | : | |

## REPORT AND RECOMMENDATION

### I.    Statement of Facts and of the Case

The petitioner in this case is a convicted murderer, and criminal recidivist, whose calculated crimes were aptly described by the United States Court of Appeals for the Third Circuit in the following terms:

> Diehl–Armstrong, a resident and native of Erie, Pennsylvania, inherited $250,000 upon her mother's death in July 2000.  Her father also received an inheritance worth $3 million.  Concerned that her father was squandering those funds, which, but for his profligacy, she thought would eventually pass to her, Diehl–Armstrong began to plot both against him and against PNC Bank, which Diehl–Armstrong believed was facilitating her father's spending.

In early 2003, Diehl–Armstrong brought a group of friends and acquaintances in on her plans. She first met with Kenneth Barnes, whom she had known for several years, and offered him $100,000 to kill her father. She also asked him to join in the robbery of a PNC Bank branch office in Erie. The robbery plan, such as it was, involved sending someone with a bomb into the bank to demand $250,000. Diehl–Armstrong and Barnes discussed the logistics of making a timed pipe-bomb to accomplish the task.

The robbery plot lay dormant for a few months, until a June 2003 party at Barnes's home. At the party, Diehl–Armstrong discussed her plans with Barnes and other attendees, including Jim Roden, her boyfriend at the time, and William Rothstein, a high-school shop teacher to whom she had previously been engaged. Barnes initially declined to participate in the bank robbery but acquiesced once Diehl–Armstrong stated that payment for killing her father would come out of the robbery proceeds. Roden, however, objected to the plan and threatened to notify police. To prevent this, in August 2003, Diehl–Armstrong shot and killed Roden in the home they shared. She enlisted Rothstein to assist in hiding Roden's body by placing it in a freezer at Rothstein's house. Rothstein also disposed of personal items belonging to Roden, the gun used to shoot Roden, and other evidence of the murder.

Following Roden's murder, the smaller group continued with its preparations. They planned to have an acquaintance named Brian Wells enter the bank to demand $250,000 while strapped with a bomb. On August 28, 2003, the plan was set in motion with Rothstein attaching a bomb to Wells's collar and starting a one-hour timer on the device. Rothstein threatened to detonate the bomb if Wells did not rob the bank, and Wells then drove to the chosen PNC branch, entered, and demanded $250,000 from the teller. The teller handed over $8,702, and Wells fled. He had been instructed to drive to a nearby McDonald's, which he did. Upon arriving, he found a note directing him to a new location where he would supposedly find instructions to disarm the bomb. State police, however, surrounded Wells, preventing him from continuing to the next location. Wells informed police that he had a bomb around his neck and

the bomb squad was called.  Before their arrival, however, the bomb detonated, killing Wells.

Not long after the botched bank robbery, Diehl–Armstrong began pressuring Rothstein to dispose of Roden's body.  Rothstein reacted by contacting police in September 2003 and revealing the details of Roden's murder.  The police promptly arrested Diehl–Armstrong, charging both her and Rothstein with Roden's death.  In the Pennsylvania Court of Common Pleas, Erie County, Diehl–Armstrong pled guilty but mentally ill to third-degree murder and abuse of a corpse in connection with Roden's murder.  She received a sentence of 7 to 20 years' imprisonment. After seeing news coverage of Diehl–Armstrong's arrest, Barnes called the coroner's office to help identify Roden's body.  Based upon his identification, police began to question Barnes with respect to his knowledge of Roden's murder.  In the subsequent interviews, Barnes told police about his involvement in the bank robbery plot.  In addition to that information, evidence found at Rothstein's house led police to connect Rothstein and Diehl–Armstrong to the bank robbery.

Meanwhile, Diehl–Armstrong initiated a series of meetings with law enforcement officials at which she volunteered information relating to the robbery.  Thereafter, on July 9, 2007, a federal grand jury indicted Diehl–Armstrong and Barnes for armed bank robbery, 18 U.S.C. § 2113, use of a destructive device in furtherance of a crime of violence, 18 U.S.C. § 924, conspiracy to commit armed bank robbery, and conspiracy to use a destructive device in furtherance of a crime of violence [and Diehl-Armstrong was subsequently convicted of these federal offenses.]

United States v. Diehl-Armstrong, 504 F. App'x 152, 153-54 (3d Cir. 2012) cert. denied, 133 S. Ct. 958, 184 L. Ed. 2d 744 (U.S. 2013).

As a result of her state convictions, on January 7, 2005, the petitioner was sentenced in state court to Erie 84 to 240 months incarceration for violating 18 Pa.C.S. § 2502(c)(Murder of the third degree) and 2 years probation for violating 18 Pa.C.S.

3

§ 5510 (Abuse of corpse). The minium term on the petitioner's state sentences expired on September 21, 2010, and the petitioner has been considered for parole on three occasions–June 22, 2011, June 21, 2012, and June 12, 2013. (Doc. 9.) On each occasion the Parole Board exercised its discretion and denied Diehl-Armstrong parole citing the heinous nature of her crimes, her minimization of her offense conduct, the pending federal detainer, the danger she presented to the community and the recommendations of prosecuting authorities that this serial killer not be released on parole. (Id.)

Dissatisfied with this outcome, Diehl-Armstrong, who is proceeding *pro se*, has filed a petition for writ of habeas corpus which contends that the Parole Board's decision to deny her early release on parole violates her constitutional rights. This matter has been fully briefed by the parties, and is now ripe for disposition. For the reasons set forth below, it is recommended that this petition be denied, since Diehl-Armstrong is not entitled to use a writ of habeas corpus to compel state parole officials to deviate from the parole outcome mandated by her own repeated misconduct.

4

III.   **Discussion**

A.   **State Prisoner Habeas Relief–The Legal Standard**

A state prisoner seeking to invoke the power of this Court to issue a writ of habeas corpus must satisfy the standards prescribed by Title 28, United States Code, Section 2254, which provides in part as follows:

> **(a)** The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> **(b)(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> > **(A)** the applicant has exhausted the remedies available in the courts of the State;
> >
> > . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> **(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254 (a) and (b).

**(1).   Substantive Standards Governing Section 2254 Petitions**

As this statutory text implies, state prisoners must meet exacting substantive and procedural benchmarks in order to obtain habeas corpus relief.  At the outset, federal

courts may "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  By limiting habeas relief to state conduct which violates "the Constitution or laws or treaties of the United States", Section 2254 places a high threshold on the courts.  Typically, habeas relief will only be granted to state prisoners in those instances where the conduct of state proceedings resulted in a "fundamental defect which inherently results in a complete miscarriage of justice" or was completely inconsistent with rudimentary demands of fair procedure.  See e.g., Reed v. Farley, 512 U.S. 339, 354 (1994).  Thus, claimed violations of state law, standing alone, will not entitle a petitioner to Section 2254 relief, absent a showing that those violations are so great as to be of a constitutional dimension.  See, Priester v. Vaughan, 382 F.3d 394, 401-02 (3d Cir. 2004).

> ## B.  Diehl-Armstrong's Petition Should Be Denied Because She Has Not Shown That He Is Entitled to Use a Writ of Habeas Corpus to Compel Favorable Parole Consideration

In this case the petitioner is a criminal recidivist, and calculated killer, who now claims that parole officials have violated her constitutional rights under the due process and *ex post facto* clauses of the United States constitution by refusing her

early release on parole.  When we consider the merits of these claims we find that this petition fails because Diehl-Armstrong simply has not identified state conduct in this case which violates "the Constitution or laws or treaties of the United States" and led to a fundamental defect which inherently resulted in a complete miscarriage of justice in a fashion which was completely inconsistent with rudimentary demands of fair procedure.

Here, the gist of the petitioner's argument is that prison officials denied her right to due process through an *ex post facto* application of Pennsylvania's  parole laws to her case.  Diehl-Armstrong, however, advances this claim in the context of parole decisions that denied early favorable parole release to her because she was a coldly calculated criminal recidivist and serial killer who denied culpability, and possessed a high potential for future violence.  On these facts, it is clear that Diehl-Armstrong cannot state an *ex post facto* clause or due process claim which would entitle her to relief.

## 1.    This *Ex Post Facto* Clause Claim Fails

Turning first to Diehl-Armstrong's *ex post facto* argument, the petitioner faces a specific and compelling burden when advancing an *ex post facto* clause challenge to state parole decisions.  The *ex post facto* clause of the United States Constitution

generally prohibits Congress and the states from enacting any law that imposes a punishment for an act which is not punishable at the time it was committed; or imposes additional punishment to that then prescribed.  In Collins v. Youngblood, 497 U.S. 37 (1990), the Supreme Court explained that to be *ex post facto*, a law must either punish as a crime an act previously committed which was innocent when done; make more burdensome the punishment for a crime after its commission; or, deprive one charged with a crime of any defense that was available when the act was committed. Youngblood, 497 U.S. at 52. As the Court explained in California Depart. of Corrections v. Morales, 541 U.S. 499 (1995), the clause is "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" Morales, 541 U.S. at 504.  Thus:

> [T]he focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' nor ... on whether an amendment affects a prisoner's '*opportunity* to take advantage of provisions for early release,'... but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable.
> Morales, 541 U.S. at 506, n.3 (emphasis original).

By eschewing an *ex post facto* analysis which focuses on some ambiguous or theoretical sort of disadvantage, the Supreme Court has formulated in the field of parole revocations an *ex post facto* standard that examines whether a claimed

retroactive application of a change in a parole regulation creates "a sufficient risk of increasing the measure of punishment attached to the covered crimes" for the particular inmate challenging the law.  Garner v. Jones, 529 U.S. 244, 250 (2000). The petitioner bears the burden on this issue:  she "must show that *as applied to h[er] own sentence* the law created a significant risk of increasing h[er] punishment." Garner, 529 U.S. at 255 (emphasis added).  Therefore, a petitioner who challenges parole decisions on *ex post facto* grounds has the heavy burden of showing that, when applied to her case, the use of some parole guidelines significantly risked an increase in her punishment in violation of the *ex post facto* clause.  See Blair-Bey v. Quick, 159 F.3d 591, 592 (D.C. Cir. 1998); Richardson v. Pennsylvania Board of Probation and Parole, 423 F.3d 282, 288 (3d Cir. 2005) ("[A] 'speculative and attenuated possibility. . . of increasing the measure of punishment' is not enough.")(quoting California Dep't of Corrections v. Morales, 514 U.S. 499, 509 (1995).

These principles apply with particular force to *ex post facto* claims made by criminal recidivists who contest the state parole board's judgment that they present a continuing risk to the community.  With respect to such offenders, the guiding legal standards can be simply stated:

> The Ex Post Facto Clause states that "[n]o State shall ... pass any ... ex post facto Law."  U.S. Const. art. I, § 10, cl.1.  The Clause applies to a statute or policy change which "alters the definition of criminal

conductor increases the penalty by which a crime is punishable." The ex post facto inquiry has two prongs:  (1) whether there was a change in the law or policy which has been given retrospective effect, and (2) whether the offender was disadvantaged by the change.  To violate the Ex Post Facto Clause, a retroactive change in the law or policy must create a "sufficient risk of increasing the measure of punishment attached to the covered crimes"; a "speculative and attenuated possibility of ... increasing the measure of punishment" is not enough.

Richardson v. Pa. Bd. of Probation and Parole, 423 F.3d 282, 287-88 (3d. Cir. 2005)(citations omitted).

Since proof of an *ex post facto* violation requires both proof of a change in the law, and evidence that "the offender was disadvantaged by the change," Richardson v. Pa. Bd. of Probation and Parole , 423 F.3d at 287-88, to sustain such a claim the petitioner must show that a change in the law, retroactively applied to her, created an "individualized disadvantage" in securing parole.  Richardson v. Pa. Bd. of Probation and Parole, supra; Yeckel v. Commonwealth of Pennsylvania, No. 05-839, 2006 WL 891461, *4 (W.D. Pa., March 29, 2006).  To meet this burden a petitioner must make an exacting showing.  "The mere intuition that stricter standards are more likely to lead to an adverse result is insufficient.  Rather, [a petitioner] must provide such evidence as indications that [s]he would have been a good candidate for parole under the old law, . . . , and the extent to which the reasons given for denying h[er] parole would not have been [previously] considered." Taylor v. Pa. Board of Probation and

10

Parole, 181 F.App'x, 253, 254-255 (3d Cir. 2006); See Shaffer v. Meyers, 163 F.

Appx. 111 (3d Cir. 2006). See also Sheffield v. Pa. Department of Corrections, No.

07-2046, 2009 U.S. Dist. LEXIS 5110, at *6 (M.D. Pa. January 26, 2009).  Applying

these standards, courts have consistently rejected efforts by unrepentant violent

offenders to use the Constitution's *ex post facto* clause as a means of securing early

release on parole, often reasoning that it was the offender's conduct rather than any

change in the law which led to the Parole Board's decision.  See e.g., Pleaze v. Klem,

335 F.App'x 168, 171-72 (3d Cir.2009); Taylor v. Pa. Board of Probation and Parole,

181 F.App'x, 253, 254-255 (3d.Cir. 2006); Barrett v. Bretton, No. 08-117, 2010 WL

330250 (W.D. Pa. Jan. 11, 2010); Sheffield v. Pa. Dep't of Corrections, No. 07-2046,

2009 WL 210490 (M.D. Pa. Jan. 26, 2009); Trivit v. Klem, No. 07-883, 2008 WL

4616800 (M.D. Pa. Oct. 16, 2008); Smythe v. Diguglielmo, No. 05-5869, 2007 WL

2972586 (E.D. Pa. Oct. 10, 2007).

These principles are fully applicable here, and are fatal to this *ex post facto*

claim, since it is evident that the denial of Diehl-Armstrong's parole is not a function

of changes in the law, but rather is a product of her violent recidivism, serial killings,

unrepentant attitude and the risk she presents to the community.  In fact, Diehl-

Armstrong's petition fails on both elements of the *ex post facto* analysis articulated by

the courts.  Diehl-Armstrong makes no intelligible claim that a specific, retroactive

change in the law has impaired her ability to gain parole.  Instead, the evidence strongly suggests that stubborn facts stand between Diehl-Armstrong and parole. These facts include her involvement in two calculated killings, murders marked by brutality, sadism, cruelty, and the morbid abuse of her victims, both living and dead. Since Diehl-Armstrong has not shown that any change in the law created an "individualized disadvantage" for the petitioner in securing parole, Richardson v. Pa. Bd. of Probation and Parole, supra; Yeckel v. Commonwealth of Pennsylvania, No. 05-839, 2006 WL 891461, *4 (W.D. Pa., March 29, 2006), this *ex post facto* clause claim fails.

### 2.    This Petition Does Not State A Valid Due Process Claim

Nor does Diehl-Armstrong state a valid due process claim in her petition.  In this regard, Diehl-Armstrong simply errs when she suggests that she might have some substantive right to parole.  Quite the contrary, federal courts have routinely rejected suggestions by state prisoners that discretionary parole denials offend due process. See, e.g., Williams v. Pa. Bd. of Probation and Parole, No. 07-3158, 2008 WL 5120773 (E.D. Pa. Oct. 31, 2008); Walls v. Attorney General, No. 06-1598, 2007 WL 4190790 (W.D. Pa. Nov. 26, 2007); Zuniga v. Pa. Bd. of Probation and Parole, No. 05-5517, 2007 WL 1002179 (E.D. Pa. March 29, 2007); Anderson v. Pa. Bd. of Probation and Parole, No. 05-00163, 2006 WL 1149233 (M.D. Pa. April 26, 2006); Bonsall v.

12

Gillis, 372 F.Supp. 2d 805 (M.D. Pa. 2005); Bachman v. Jeffries, 488 F.Supp. 107 (M.D. Pa. 1980).

These cases are grounded upon several basic tenets of constitutional law. At the outset, these cases acknowledge that it is well-settled that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." Greenholtz v. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1, 7 (1979); see also Rauso v. Vaughn, 79 F. Supp. 2d 550, 551 (E.D. Pa.2000)(the federal constitution does not create an entitlement to parole). These cases all further recognize that the Pennsylvania parole statute does not create a liberty interest in the right to be paroled. Burkett v. Love, 89 F.3d 135, 139 (3d Cir.1996); Rodgers v. Parole Agent SCI-Frackville, 916 F. Supp. 474, 476-77 (E.D. Pa. 1996); McCrery v. Mark, 823 F.Supp. 288, 294 (E.D. Pa. 1993). Rather, as the Pennsylvania Supreme Court has aptly noted, under state law: "It is undisputed that [an inmate] does not have a clear legal right to the grant of parole, nor does the board have a corresponding duty to grant the same." Coady v. Vaughn, 770 A.2d 287, 289(2001); see also Rogers v. Pa. Bd. of Probation and Parole, 724 A.2d 319, 323 (Pa. 1999).

Since a discretionary decision of the Parole Board denying an inmate early parole does not implicate any constitutionally protected liberty interest, the scope of

federal judicial review of these decisions is necessarily quite limited.  In the absence

of a specific, articulated constitutional right to parole, the role of this Court in

reviewing a state parole denial has been defined by the United States Court of Appeals

for the Third Circuit in the following terms:  "[E]ven if a state statute does not give

rise to a liberty interest in parole release under Greenholtz, once a state institutes a

parole system all prisoners have a liberty interest flowing directly from the due process

clause in not being denied parole for arbitrary or constitutionally impermissible

reasons." Block v. Potter, 631 F.2d 233, 236 (3d Cir.1980); Bonsall v. Gillis, 372

F.Supp.2d 805, 807 (M.D. Pa. 2005)(quoting Block).  However, when ensuring that

state parole denials are not motivated by arbitrary or constitutionally impermissible

reasons, it is clear that "federal courts, . . . are not to 'second-guess parole boards', and

the requirements of substantive due process are met if there is some basis for the

challenged decision." Hunterson v. DiSabato, 308 F.3d 236, 246 (3d Cir. 2002). See

also Coady v. Vaughn, 251 F.3d 480, 487 (3d Cir. 2001)(held, federal courts are not

authorized by the due process clause to second-guess parole boards and the

requirements of substantive due process are met if there is some basis for the

challenged decision).  Moreover, the "relevant level of arbitrariness required to find

a substantive due process violation involves not merely action that is unreasonable,

but, rather, something more egregious, which we have termed at times 'conscience shocking' or 'deliberately indifferent.'" Hunterson, 308 F.3d at 247.

Judged against this deferential standard, Diehl-Armstrong's complaints that she was not given the more favorable parole consideration simply does not state a claim which shocks the conscience or is sufficiently egregious to be characterized as arbitrary and capricious. These parole denial decisions rested on the immutable fact that the petitioner is a violent offender, whose crimes reflected a stunning degree of calculated cruelty. Given the factors cited as the expressed grounds for denial of her parole, these Parole Board judgments appear to represent a careful, informed balancing of the interests of both the inmate and society. They were, therefore, the very essence of informed, discretionary decision-making which is the duty and responsibility of the Parole Board. Since nothing in these Parole Board decisions offends constitutional due process considerations, this due process claim fails on its merits.

### III.   **Recommendation**

Accordingly, for the foregoing reasons, upon consideration of this Petition for Writ of Habeas Corpus filed pursuant to 28, United States Code, § 2254, IT IS RECOMMENDED that the Petition be DENIED, and that a certificate of appealability should not issue.

The Petitioner is further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 17th day of April, 2014.

*S/Martin C.  Carlson*
Martin C. Carlson
United States Magistrate Judge